1  **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                       **FOR THE DISTRICT OF ARIZONA**

8

9  Vladik Uchikura,                              No. CV-22-00002-PHX-DWL

10                   Plaintiff,                   **ORDER**

11  v.

12  Willis Towers Watson Call Center, et al.,

13                   Defendants.

14

15         Vladik S. Uchikura ("Plaintiff"), who is proceeding *pro se*, has sued his former

16  employer ("Defendants")[1] for employment discrimination under the Americans with

17  Disabilities Act ("ADA"), the Rehabilitation Act of 1973, and the Arizona Civil Rights Act

18  ("ACRA").  Now pending before the Court is Defendants' motion to dismiss for failure to

19  state a claim.  (Doc. 17.)  For the following reasons, the motion is granted.

20                              **BACKGROUND**

21  I.    Facts

22         The following facts, presumed true, are derived from the First Amended Complaint

23  ("FAC").  (Doc. 12.)  Plaintiff was hired by Defendants on May 20, 2019.  (*Id.* at 11 ¶ 1.)

24  ─────────────────────

[1]      In the First Amended Complaint ("FAC"), the two named defendants are (1) "Willis
25  Towers Watson US LLC" and (2) "Willis Towers Watson Tempe Location."  (Doc. 12 at
2.)  In their motion to dismiss, Defendants identify themselves as "Willis Towers Watson
26  US LLC" and "Extend Health LLC" and contend they were incorrectly identified in the
FAC.  (Doc. 17 at 1.)  In his response, Plaintiff describes Defendants as "Willis Towers
27  Watson Call Center (Extend Health, LLC)" and "Willis Towers Watson Headquarters
(Willis Towers Watson, PLC)."  (Doc. 28 at 1, 4.)  Although this seeming dispute over the
28  identity of the Defendants may need to be resolved at a future stage of this case, it is
unnecessary to resolve it now.

1    At all relevant times, Plaintiff was supervised by Jacob Jungers, who in turn reported to

2    Mark Peskin. (*Id.* at 11 ¶ 2.) Other relevant actors include Lead Human Resources ("HR")

3    Generalist Gabriel Guzman and Operations Manager Lynn Lewis. (*Id.*)

4         Plaintiff has physical impairments that cause him pain and require him to use a

5    wheelchair, specific shoes, and voice-to-text software (*i.e.*, the "Dragon Naturally

6    Speaking" program). (*Id.* at 12 ¶ 7, 13 ¶ 9, 14 ¶ 10, 15 ¶ 11.) Plaintiff also suffers from

7    anxiety. (*Id.* at 15 ¶ 11.) "[F]rom start to end" of his employment, Plaintiff was "threatened

8    and intimidated, discriminated, retaliated, targeted, harassed, endangered, falsely accused,

9    bullied, falsely imprisoned, treated with bias, invalidated and denied disability and need

10   for accommodations all due to his disability and his fear (due to anxiety and other

11   disabilities) to point out [Defendants'] ADA insufficiencies." (*Id.* at 11 ¶ 3.)

12        First, in May 2019, Plaintiff "went to urgent care [and] returned to work the next

13   day with the doctors [sic] note and was given a hard time by [Guzman]," who "pulled

14   [Plaintiff] out of class" early and told Plaintiff "that a doctor's note was not an excusable

15   form of absence, and if [Plaintiff] did not past [sic] the nesting period test to graduate to

16   the call center floor, that he would be terminated as a result." (*Id.* at 12 ¶ 6.) Plaintiff felt

17   Guzman was "sabotaging" Plaintiff's ability to complete the training. (*Id.*)

18        Next, on June 19, 2019, Defendants "had a big client coming in." (*Id.* at 13 ¶ 9.)

19   Jungers asked Plaintiff to "log out, clock out, and go home and change shoes," which were

20   "All Star Converse," and then come back to work. (*Id.*) Plaintiff "refused because

21   [Defendants] never gave him notice ahead of time and his shoes were never a problem

22   before. In fact, they told him it was okay because he needs to wear two different sizes of

23   shoes due to his physical condition." (*Id.*) When Plaintiff asked to speak to Peskin about

24   the matter, Defendants "made [Plaintiff] clock out and log out of his computer, wait 45

25   minutes, then moved him to the back of the call center out of view of the client and his

26   colleagues." (*Id.*) "When [Plaintiff] refused to leave, they made him wait around the zone

27   where all his colleagues worked for at least the first 20 minutes, then moved him to the

28   back to calm him down and get him away from his co-workers as he was being vocal about

management asking him to leave because of his shoes, which was upsetting his coworkers and further exacerbating his anxiety." (*Id.* at 13-14 ¶ 9.) "Eventually, [Defendants] said they would give him that 45 minutes back, and that his shoes were okay." (*Id.*)

Next, on August 9, 2019, Plaintiff instant-messaged Guzman "to see if they have acquired Dragon Naturally Speaking software." (*Id.* at 14 ¶ 10.) Guzman "replied that they haven't yet and that it takes time for things like this." (*Id.*) After that conversation, there was "no other word about the software" until an HR meeting in which Plaintiff's request was denied. (*Id.*) At the HR meeting, "Guzman informed [Plaintiff] that because [Plaintiff] was not upheld to any consequences, like other employees who only had two minutes to type up their notes after each call, that the software was not necessary for [Plaintiff], despite the physical toll typing takes on [Plaintiff's] body." (*Id.*) HR was aware that Plaintiff requested the accommodation because of this toll. (*Id.*)

Plaintiff also alleges that the internal doors of the building in which he worked (and Defendants' Tempe "campus" in general) lacked "ADA buttons and windows." (*Id.* at 12 ¶ 7.) Thus, after entering the building, Plaintiff had to "rely on everyone around him to get past the lobby" (*i.e.*, into the call center) and to enter the break room, bathroom, meeting rooms, or lunchroom. (*Id.* at 16 ¶ 11.) Also, the lack of a "push to open button" for the windowless doors between the lobby and call center meant that "a non-suspecting person on the other side may hit you with the heavy door, not knowing you are on the other side"— this happened to Plaintiff "multiple times" and he "started experiencing . . . PTSD on the job due to this fear of getting hit and hurt and having his chair (which are his legs and his actual legs too) damaged." (*Id.* at 16-17 ¶ 11. *See also id.* at 19 ¶ 14 ["Sometimes employees would push the door into [Plaintiff], because they couldn't see him, hitting his head, legs, feet, hands, elbow—it gave [Plaintiff] bruises and stomach pain (urgent care), along with anxiety and fear of getting injured."].) Plaintiff "still experiences this PTSD today when he's out in public without his aide" and his wheelchair is still damaged from "the heavy doors constantly hitting his joystick," which caused "issues with the electrical system in the joystick of his wheelchair." (*Id.* at 12 ¶ 7, 17 ¶ 11.) At least some of this

damage occurred after Lewis "[s]uggested [Plaintiff] ram the doors with his expensive wheelchair . . . to get in and out of the building and bathroom." (*Id.* at 13 ¶ 8 [noting Lewis made this suggestion on October 24, 2019].).

Because the bathroom doors lacked ADA buttons, Plaintiff "[a]lways had to ask a guard or colleague to help him get in and out of the bathroom," which was "humiliating and degrading" and made him feel like "an unwelcome hire." (*Id.* at 17 ¶ 12.) On November 15, 2019, Plaintiff "was trapped in the bathroom for 45 minutes because the guard had left for the day and . . . there are no handicapped accessible buttons for the restrooms," at which point he "was forced to call Gabe Guzman to help him and [Guzman] was rude which caused [Plaintiff] anxiety." (*Id.*)[2]

To access the breakroom, which "does not have an ADA button to open the heavy steel door," Plaintiff "usually had to wait for someone to let him in and out." (*Id.* at 19 ¶ 14. *See also id.* ["[Plaintiff] has been trapped in there until someone comes in."].) In a related vein, because Plaintiff "couldn't get in or out of the lunchroom or to the outside patio, and the guards or other employees [weren't] always available to assist him," he began eating lunch in the lobby and taking his breaks in the call center workspace, both of which led to him being written up. (*Id.* at 21-22 ¶ 21.)[3]

"[T]here is no push-to-open button at the front entrance of the building, instead, it's located at the back of the building," "segregat[ing]" handicapped individuals. (*Id.* at 15-16 ¶ 11.) Moreover, the ADA button for the back entrance is "positioned on the opposite side of the badge scanner," thus imposing "more of a burden and liability for those that are physically handicapped" because "you must scan your badge first and then get over to the ADA button in less than 5 seconds." (*Id.*) The badge reader was also "too high for [Plaintiff] causing him back and arm pain every time he had to use it." (*Id.* at 18 ¶ 14.) On July 24, 2019, Plaintiff was late to work because he "was struggling to get inside due to

---

[2]    Plaintiff alleges that another disabled employee was forced to "leave her scooter outside the women's restroom and struggle to get in and out, because the doors were not accessible to her either." (Doc. 12 at 17 ¶ 12.)

[3]    Plaintiff acknowledges he was also written up for "sulking and pouting." (*Id.* at 21 ¶ 20.)

the button deficiency and was waiting for security to help," who had not yet arrived for the day, in the "the blistering hot AZ summer sun." (*Id.* at 16 ¶ 11.)  On September 8, 2019, Plaintiff was again stuck outside the building.  (*Id.* at 17-18 ¶ 13.)  Rather than assisting, Guzman "watched [Plaintiff] struggle to get in the building . . . and didn't help." (*Id.* at 17-18 ¶ 13.  *See also id.* at 18 ¶ 13 [noting that, once Plaintiff got inside, Guzman "offered [him] a can of soda as if that would be a gesture of kindness after [Guzman] watched [Plaintiff] struggle in the heat").  At some point between September 16 and September 30, 2019, Plaintiff "was accused of not badging in" because he "was working with the security guards to badge into the building or any other respective locations of the campus or building requiring you to badge in, because of the challenge he had with their badge reader location and the physical toll required on him."  (*Id.* at 22 ¶ 23.  *See also id.* ["All these guards did was simply expedite the process [Plaintiff] would have taken to badge in and save him some steps and time."].)

Throughout his employment, Plaintiff was targeted with attendance write-ups as a "form of punishment."  (*Id.* at 11 ¶ 3.)  He also alleges multiple instances in which his tardiness was due to his physical limitations.  For example, when Plaintiff "fell in his car," Defendants penalized him for being late.  (*Id.* at 18 ¶ 14; *id.* at 21 ¶ 19 [Plaintiff was "docked for being late" when, after falling in his car, Plaintiff called security, who "said to call an ambulance because [the guard] could not leave her post" and then "hung up on him"].)  On September 24, 2019, after Plaintiff returned to work "20 minutes late from his 30-minute lunch," "he was pulled into [Peskin's] office right away" and Peskin began yelling at Plaintiff, "saying things like 'don't lie to me!' and 'Cut the bullshit . . . !'" (*Id.* at 14-15 ¶ 11.)  Plaintiff alleges he was running late because he "had gone to Safeway and because his disability was flaring up on him, it took him longer." (*Id.* at 15 ¶ 11)  "Due to his anxiety," Plaintiff found it "difficult . . . to communicate that . . . the building is inaccessible and therefore, difficult to navigate" and that he "took his lunch outside [Defendants'] campus and went to Safeway" because he didn't "want to get stuck or repeatedly ask for help and rely on others . . . ." (*Id.*  *See also id.* ["Disabled handicap spots

in front are not always available that are closest to [Plaintiff's] desk—other spots are in the back of the building."].)[4]  During this incident, Plaintiff and Peskin were alone in Peskin's "small claustrophobic office" and the yelling triggered Plaintiff's anxiety and caused "pain throughout his body." (*Id.*)  Ultimately, Plaintiff was written up for "lying about taking a long lunch." (*Id.*)  Plaintiff "[a]t times . . . skipped his lunch after this for fear of retaliation and further repercussions." (*Id.* at 17 ¶ 11.)  Plaintiff alleges, albeit somewhat indirectly, that he attempted to avoid attendance write-ups by having the guards "note the time he came into the building and inform his supervisors." (*Id.* at 18 ¶ 14 ["For example, [Plaintiff] would arrive at 8:57, but not at his physical desk/workstation until 9:09."].) However, Guzman "would not agree to this arrangement." (*Id.*)[5]

During training, Defendants would "pull [Plaintiff] out . . . for interrogation sessions" related to his attendance, during which "they said they would not remove the [attendance] points and they would fire him" if "he didn't pass the test." (*Id.* at 19 ¶ 14.) Plaintiff describes this as "sabotage," because "he was pulled out of training but still expected to take the test and pass." (*Id.*)  The "interrogation sessions" occurred "either weekly or twice a week," lasting one to two hours on average (but once three and a half hours). (*Id.*)  "Some were on the same topic twice a day, with different management . . . . They were repetitive and intimidating as they were trying to have him confess to being intentionally late." (*Id.*)[6]  Plaintiff felt this was unfair, in part, because he had at least two or three client "kudos," but Defendants "only wanted to focus on [him] being late." (*Id.* at 20 ¶ 14.)  Guzman, specifically, was "always threatening and intimidating" and "would shake his head at [Peskin] right in front of [Plaintiff]." (*Id.* at 19 ¶ 14.  *See also id.* ["They

---

[4]    On an unspecified date, Plaintiff was "yelled at for calling the police on a sporty red BMW that was parked in a handicap spot, because [Defendants] didn't do anything." (*Id.* at 20 ¶ 15.  *See also id.* ["They said it was not [Plaintiff's] right to call the police."].)

[5]    Plaintiff also alleges that an "advocate for the disabled was let go because she had surgery and needed to get up every hour for 10 minutes to walk around, and they wouldn't let her do that." (*Id.* at 22 ¶ 24.)

[6]    Plaintiff also alleges that "[Defendants] didn't want to acknowledge his mental health issues due to the stress of the continuous daily struggle with their inaccessible building." (*Id.* at 19-20 ¶ 14.)

were aggressive, hostile, intimidating and created an unsafe (physically and emotionally) work environment."].)

On November 25, 2019, Plaintiff resigned.  (*Id.* at 11 ¶ 1, 18 ¶ 14.)  According to Plaintiff, several issues contributed to his resignation, which he describes as a "constructive discharge."  (*See, e.g.*, *id.* at 21 ¶ 18.)  First, the building's inaccessibility made him constantly reliant on the security guards, "compromised his independence," "endanger[ed] him at times," and led to him being "falsely imprison[ed] . . . when having to wait in the bathroom or outside in the AZ summer heat."  (*Id.*)  Second, Plaintiff was disciplined for behaviors related to his disability, such as being late after falling in his car and eating lunch with the security guards because "he couldn't get in or out of the lunchroom or to the outside patio" (and, for the same reason, spending his breaks either off-campus or in the call center "talking to other employees at their workstations while on his break even if those employees may not be on break").  (*Id.* at 21-22 ¶¶ 19, 21.)  Third, Plaintiff was subjected to "harassment" when Defendants accused him of not badging in despite the fact that he was merely "working with the security guards to . . . badge in, because of the challenge he had with their badge reader location and the physical toll required on him."  (*Id.* at 22 ¶ 23.)

On December 13, 2019, Plaintiff met with an investigator at the Equal Employment Opportunity Commission ("EEOC") for an intake interview.  (*Id.* at 23 ¶ 28.)  Plaintiff alleges that the EEOC provided "misleading and incomprehensible instructions . . . on the next steps of his charge" and "lost [his] case . . . due to COVID-19, resulting in the 300 days statue[] of limitations [being] exceeded."  (*Id.*)

Plaintiff ultimately filed a charge of discrimination with the EEOC on October 3, 2021.  (*Id.* at 8 [charge form].)  Three days later, the EEOC issued a Right to Sue letter to Plaintiff, which informed Plaintiff that the EEOC was closing its file because Plaintiff's "charge was not timely filed with the EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge."   (*Id.* at 7.)

…

1    II.    Procedural History

2           On January 3, 2022, Plaintiff initiated this action.  (Doc. 1.)[7]

3           On May 20, 2022, before serving any Defendant with the original complaint (and

4    after obtaining an extension of time to effect service, *see* Doc. 11), Plaintiff filed the FAC.

5    (Doc. 12.)[8]

6           On June 13, 2022, Defendants filed the pending motion to dismiss.  (Doc. 17.)

7           On August 16, 2022, after obtaining several extensions of time to do so (Docs. 21,

8    27), Plaintiff filed a response to Defendants' motion to dismiss.  (Doc. 28.)

9           On August 23, 2022, Defendants filed a reply.  (Doc. 29.)  Neither side requested

10   oral argument.

11                                   **DISCUSSION**

12   I.    Legal Standard

13          "[T]o survive a motion to dismiss under Rule 12(b)(6), a party must allege sufficient

14   factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *In re*

15   *Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (internal quotations

16   omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that

17   allows the court to draw the reasonable inference that the defendant is liable for the

18   misconduct alleged."  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "[A]ll

19   well-pleaded allegations of material fact in the complaint are accepted as true and are

20   construed in the light most favorable to the non-moving party."  *Id.* at 1444-45 (citation

21   omitted).  However, the court need not accept legal conclusions couched as factual

22   allegations.  *Iqbal*, 556 U.S. at 679-680.  Moreover, "[t]hreadbare recitals of the elements

23   of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* at 678.

24   The court also may dismiss due to "a lack of a cognizable theory."  *Mollett v. Netflix, Inc.*,

25

26   [7]      The matter was initially assigned to Judge Rayes.  (Doc. 1 at 1.)  On June 28, 2022, Judge Rayes recused himself and the matter was reassigned to the undersigned.  (Doc. 20.)

27   [8]      Although Defendants assert in a footnote in their motion to dismiss that Plaintiff's amendment attempt was procedurally improper (Doc. 17 at 1 n.1), the relief sought in the motion is the dismissal of the FAC.  Accordingly, the Court will treat the FAC as Plaintiff's
28   operative pleading.

795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

The Ninth Circuit has instructed that courts must "construe *pro se* filings liberally," "particularly in civil rights cases." *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010). A "complaint [filed by a *pro se* litigant] 'must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Id.* (citation omitted). Conclusory and vague allegations, however, will not support a cause of action. *Ivey v. Bd. of Regents of the Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982). A liberal interpretation may not supply essential elements of the claim that were not initially pleaded. *Id.*

II.    The Parties' Arguments

Defendants move to dismiss FAC for three reasons. (Doc. 17.) First, Defendants contend that "Plaintiff failed to exhaust his administrative remedies." (*Id.* at 1.) Specifically, Defendants note that "[s]ome of Plaintiff's claims . . . require exhaustion of administrative remedies" but "Plaintiff failed to timely file the obligatory charge(s) with the appropriate administrative bodies." (*Id.* at 6, internal citations omitted.) Defendants further contend that "equitable tolling does not apply" because "Plaintiff was not diligent in pursuing his charge." (*Id.* at 7-8, internal citations omitted.) Second, Defendants contend that "Plaintiff's claims are time-barred by the applicable statute of limitations." (*Id.* at 8-9.) Third, Defendants contend the FAC fails to state a claim under Rule 12(b)(6) and also violates Rule 8 because it "does not adequately describe any of [Plaintiff's] claims or the elements thereof," "fails to explain which Defendant allegedly took what action, when the alleged act[ion] occurred, [or] how [Plaintiff] was harmed," and does not "identify the specific legal right that Plaintiff believes each Defendant violated." (*Id.* at 1, 5.)

Plaintiff opposes Defendants' motion. (Doc. 28.) As for administrative exhaustion, Plaintiff contends the untimeliness of his EEOC charge was due to COVID-19, which caused the EEOC to temporarily shut down, as well as "miscommunication and misunderstanding on the EEOC side" and Plaintiff's "confusion on how to file the charge." (*Id.* at 6.) Plaintiff contends that he made "a reasonable and diligent effort to meet with

the EEOC and have an interview with the agency about such inquiry and attempt to file a charge." (*Id.*)  Plaintiff continues that, although he first met with the EEOC in December 2019, "the dooming impact of COVID-19, EEOC's temporary complete shutdown and suspension of issuance of charge documents in response to the COVID-19 pandemic on March 21, 2020 until August of 2020,[9] and EEOC's confusing rules and policies that are very difficult to comprehend" caused Plaintiff not to file his charge until more than 300 days after the last instance of discrimination. (*Id.  See also id.* at 7 [arguing "the unforeseen tragic and devastating event of COVID-19 that significantly impacted the Plaintiff as well as the EEOC as a whole . . . is the justification for the change not filed in a timely manner"].)  As for the sufficiency of his claims, Plaintiff contends that he "more than reasonably and with evident effort . . . made a reasonable attempt to as clearly as possible state all the facts of the claims, how these facts apply to the law, and how these facts of the claims and allegations without doubt affect the Plaintiff, and how the violations of these laws could and can severely exploit such a vulnerable adult." (*Id.* at 4.)  Plaintiff also contends that he "has provided a detailed description" of the discrimination, including "dates of each of these allegations and claims." (*Id.* at 3-4.)  Plaintiff argues that he "has to his best ability tried to and somewhat successfully meet and exceed [his] pleading obligations" as a *pro se* litigant by providing "page after page of detailed allegations, claims, facts, quotes, and exhibits." (*Id.* at 4.)  Plaintiff also offers to submit an amended complaint "with further clarification and cures to the curable alleged defects," "if the Court will grant such [a] Motion." (*Id.* at 4-5.)

In reply, Defendants challenge Plaintiff's assertion that the EEOC "completely shut down" due to the COVID-19 pandemic. (Doc. 29 at 1-2 ["Contrary to Plaintiff's assertions, the EEOC did not completely shut down, and Plaintiff was not prevented from filing a

---

[9]      Plaintiff attaches two documents to his response as supposed evidence of the EEOC shutdown.  They are (1) an August 3, 2020 press release indicating that the EEOC had resumed "issuing charge closure documents that were suspended because of the COVID-19 pandemic" (Doc. 28-1 at 1); and (2) an undated press release indicating that "[t]he EEOC has closed its physical office to the public and implemented agency-wide expanded telework due to COVID-19 . . . [b]ut our work continues remotely" (Doc. 28-2 at 1).

charge due to COVID-19. . . .  [F]or an unspecified period, the EEOC was operating remotely – not that it had ceased operations. . . .  [T]here is no evidence that the EEOC was not accepting new charges, not investigating charges, or not operating while remote."], citation omitted.)  Alternatively, Defendants argue that even if the EEOC completely shut down between March and August of 2020, "those 4 to 5 months would not have made Plaintiff's charge timely" because "five more months would only have allowed Plaintiff to timely file until December 1, 2020" yet "Plaintiff did not file his charge until October 21, 2021 – nearly a year after the extended filing deadline Plaintiff seeks to apply." (*Id.* at 2-3, emphasis omitted.)  Defendants also contend that Plaintiff's December 2019 intake interview did not satisfy his administrative filing requirement because Plaintiff did not complete an intake form and "did not ask the EEOC to file a charge." (*Id.* at 3-4.)  In a related vein, Defendants argue that because "Plaintiff has offered no excuse for his delay," equitable tolling "cannot save his complaint." (*Id.* at 4.)  Defendants also contend that Plaintiff's failure-to-accommodate claim, specifically, is barred by "the two-year limitations period contained in A.R.S. § 41-1492.08(C)." (*Id.* at 6.)  Finally, Defendants contend that Plaintiff fails to state a failure-to-accommodate claim because the only accommodation request alleged in the FAC, for "a speech to text software," was not included in Plaintiff's EEOC charge and is not "like or reasonably related" to the allegations in the charge. (*Id.* at 5-6.)[10]  Defendants also note that "Plaintiff does not allege that Defendants refused to obtain this software," but instead acknowledges that "Defendants were in the process of obtaining the software he requested, but it had not yet happened." (*Id.* at 6.)

…

…

…

---

[10]    In a footnote, Defendants clarify that "only Plaintiff's failure to accommodate claim" is discussed in the reply because "[a]lthough Plaintiff alleges several other claims, they fail [as a matter of law] for the reasons discussed in Defendants' Motion to Dismiss." (Doc. 29 at 5 n.20.)

III.   Analysis

    A.   **Administrative Exhaustion**

Defendants contend that all three of Plaintiff's claims (*i.e.*, Plaintiff's claims under the Rehabilitation Act, ADA, and ACRA)[11] require exhaustion of administrative remedies and that Plaintiff failed to satisfy the exhaustion requirement because (1) his EEOC charge was not timely filed and (2) equitable tolling is not available here.  (Doc. 17 at 6-9.)[12]

    1.   Rehabilitation Act

As an initial matter, the FAC identifies § 503 of the Rehabilitation Act (codified at 29 U.S.C. § 793) as the provision underlying Plaintiff's Rehabilitation Act claim.  (Doc. 12 at 3.)  However, § 503 is not enforceable through a private right of action.  *Fisher v. City of Tucson*, 663 F.2d 861, 867 (9th Cir. 1981).  Given Plaintiff's *pro se* status and the fact that Defendants did not raise this issue, the Court interprets the FAC as alleging a claim under § 504 of the Rehabilitation Act, which prohibits disability discrimination against qualified individuals by "any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service."  29 U.S.C. § 794(a).  The phrase "program or activity" is broadly defined

---

[11]      In their motion, Defendants contend that "some" of Plaintiff's claims require exhaustion of administrative remedies, identifying these claims as "Title VII, retaliation, ADA, failure to accommodate, Rehabilitation Act, and ACRA."  (Doc. 17 at 6, internal citations omitted.)  This contention is confusing because the only three claims asserted in the FAC are for violation of the Rehabilitation Act, ADA, and ACRA.  (Doc. 12 at 3.)  Although the original iteration of Plaintiff's complaint appeared to include additional claims, Defendants acknowledge that the FAC "limits [Plaintiff's] claims to allege violations of the ADA, Rehab Act, and ACRA."  (Doc. 17 at 4.)

[12]      Defendants also argue, in one sentence, that Plaintiff incorrectly identified his employer as "Willis Towers Watson" in his EEOC charge when his "true employer" is Extend Health LLC and thus "did not exhaust his administrative remedies as to his true employer."  (Doc. 17 at 6.)  This argument is unavailing.  Although the general rule is that claimants may sue "only those named in the EEOC charge because only they had an opportunity to respond to charges during the administrative proceeding," *Sosa v. Hiraoka*, 920 F.2d 1451, 1458 (9th Cir. 1990), a *pro se* claimant "may not understand the need to name all parties in the charge or may be unable to appreciate parties' separate legal identities." *Lorona v. Ariz. Summit L. Sch., LLC*, 151 F. Supp. 3d 978, 987 (D. Ariz. 2015).  Thus, "charges can be brought against persons not named in an [EEOC] complaint as long as they were involved in the acts giving rise to the [EEOC] claims." *Sosa*, 920 F.2d at 1459.  At any rate, Defendants' argument depends on facts not alleged in the FAC (*i.e.*, who was Plaintiff's "true employer" and the relationship between "Watson Willis Tower" and "Extend Health LLC") and is thus inappropriate on a motion to dismiss.

1    to include "all of the operations of . . . an entire corporation, partnership, or other private

2    organization, or an entire sole proprietorship" if the entity receives federal assistance or if

3    the entity is "principally engaged in the business of providing education, health care,

4    housing, social services, or parks and recreation." *Id.* § 794(b)(3)(A).  Thus, "Section 504

5    creates a private right of action for individuals subjected to disability discrimination by any

6    program or activity receiving federal financial assistance, including employment

7    discrimination in such programs." *Fleming v. Yuma Reg'l Med. Ctr.*, 587 F.3d 938, 940

8    (9th Cir. 2009) (internal citation omitted).

9         In the context of § 504 claims, the administrative exhaustion requirement only

10   applies to claims brought by federal employees.  *See, e.g.*, *Leong v. Potter*, 347 F.3d 1117,

11   1121 (9th Cir. 2003).  In contrast, "private plaintiffs suing under section 504 need not first

12   exhaust administrative remedies." *Smith v. Barton*, 914 F.2d 1330, 1338 (9th Cir. 1990).

13   *See also Chalmers v. Intel Corp.*, 2012 WL 4514042, *2-3 (D. Ariz. 2012) (noting that

14   "[e]very circuit to address the question of whether the Rehabilitation Act requires a plaintiff

15   suing a private employer under the Rehabilitation Act to exhaust administrative remedies

16   has answered in the negative" and holding that the 1992 amendments to the Rehabilitation

17   Act did not change this rule).  Thus, Plaintiff was not required to administratively exhaust

18   his § 504 claim.  Defendants' request to dismiss the Rehabilitation Act claim on this ground

19   is denied.

20                    2.    ADA

21        Title I of the ADA, 42 U.S.C. §§ 12112 to 12117, incorporates the charge filing

22   requirements provided in Title VII of the Civil Rights Act of 1964.  *See* 42 U.S.C.

23   § 12117(a).  Those provisions, in turn, require that a complainant file an administrative

24   charge within 180 or 300 days of the last act of alleged discrimination.  *Id.* § 2000e-5(e)(1).

25   Here, the FAC pleads a claim under Title I of the ADA.  (Doc. 12 at 3.)  Thus, Plaintiff

26   was required to administratively exhaust his ADA claim by timely filing a charge with the

27   EEOC or the Arizona Civil Rights Division ("ACRD").[13]

28   ─────────────────
     [13]     "[B]ecause Arizona has its own state agency empowered to investigate and remedy
     allegations of discrimination in employment, Arizona is a so-called deferral state." *Cox v.*

                                         - 13 -

For administrative exhaustion purposes, the limitations period "begins running on any separate underlying claim of discrimination when that claim accrues." *Green v. Brennan*, 136 S. Ct. 1769, 1782 (2016). "A federal claim accrues when the plaintiff knows or has reason to know of the injury that is the basis of the action." *Ervine v. Desert View Reg'l Med. Ctr. Holdings, LLC*, 753 F.3d 862, 869 (9th Cir. 2014). Here, reading the FAC with the required liberality, the most recent claim of discrimination accrued on November 27, 2019.[14] (Doc. 12 at 4.) The relevant, subsequent dates for administrative exhaustion purposes are as follows. On December 13, 2019, Plaintiff participated in an intake interview with the EEOC. (*Id.* at 8, 23 ¶ 28.) On October 3, 2021, Plaintiff filed a formal charge with the EEOC. (*Id.* at 8.) On October 6, 2021, the EEOC dismissed the charge because it was not timely filed. (*Id.* at 7.)

Defendants contend that Plaintiff failed to satisfy the exhaustion requirement because he did not file a charge until October 2021, "nearly two years after he resigned," and that Plaintiff's earlier participation in an EEOC interview "cannot save his complaint." (Doc. 17 at 7, internal citation omitted. *See also* Doc. 29 at 3 [arguing that Plaintiff's intake interview was not a charge because Plaintiff "did not complete the document(s) to provide the EEOC with the necessary information[] and did not ask the EEOC to file a charge"].) This argument touches on two issues: first, whether Plaintiff's October 2019 intake

---

*Glob. Tool Supply LLC*, 2022 WL 4356915, *4 n.2 (D. Ariz. 2022) (internal quotations omitted). In deferral states, the deadline for a complainant to file a claim with the EEOC is extended from the ordinary 180 days to 300 days if the complainant first initiates proceedings with the state agency. *See* 42 U.S.C. § 2000e-5(e)(1). Additionally, "where, like here, the ACRD and EEOC are parties to a worksharing agreement, a complainant ordinarily need not file separately with federal and state agencies." *Cox*, 2022 WL 4356915 at *4 n.2 (internal quotations omitted). *See also Fort Bend Cnty., Texas v. Davis*, 139 S. Ct. 1843, 1846 (2019) ("If the state or local agency has a 'worksharing' agreement with the EEOC, a complainant ordinarily need not file separately with federal and state agencies.").

[14] Plaintiff provides conflicting information about the "last date" of the alleged discriminatory conduct by Defendants. Plaintiff describes the dates of discrimination as May 20, 2019 to November 27, 2019 (Doc. 12 at 4), separately attaches an EEOC charge form that identifies the date of the most recent discriminatory job action as September 5, 2019 (*id.* at 8), also attaches documents suggesting that the "last date of alleged discrimination/retaliation" by Defendant was September 10, 2019 (*id.* at 23 ¶ 27), and alleges that several instances of discriminatory conduct occurred after September 10—on September 24, 2019 (*id.* at 14-15 ¶ 11), October 24, 2019 (*id.* at 12-13 ¶ 8), and November 15, 2019 (*id.* at 17 ¶ 12).

interview constitutes a charge for purposes of administrative exhaustion; and second, even if not, whether the untimeliness of Plaintiff's October 2021 charge may be excused by equitable tolling.

a.      "**Charge**"

Although the "limitations-period analysis is always conducted claim by claim," *Green*, 136 S. Ct. at 1782, it is unnecessary to distinguish among Plaintiff's claims here because December 13, 2019 (the date of the intake interview) is within the 300-day limitations period as to all of the alleged instances of discrimination, which occurred between May 20, 2019 and November 27, 2019, and because October 3, 2021 (the date of the formal charge) is outside the 300-day limitations period as to all of the same.

Federal regulations require a "charge" to contain certain information (*e.g.*, names and contact information for the parties and a clear statement of the facts, including pertinent dates) and provide that "a charge is sufficient when the Commission receives from the person making the charge a *written statement* sufficiently precise to identify the parties, and to describe generally the action or practices complained of."  29 C.F.R. § 1601.12 (emphasis added).  The regulations allow amendment of a charge "to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations made therein."  *Id.* § 1601.12(b).

In the context of the Age Discrimination in Employment Act ("ADEA"), the Supreme Court has held that the filing of an intake questionnaire with the EEOC is "deemed a charge" only if, "[i]n addition to [containing] the information required by the regulations," it is "reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and the employer."  *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 402 (2008).  "[T]he filing must be examined from the standpoint of an objective observer to determine whether, by a reasonable construction of its terms, the filer requests the agency to activate its machinery and remedial processes . . . ."  *Id.*  District courts within the Ninth Circuit have subsequently applied the *Holowecki* analysis in ADA cases.  *See, e.g.*, *Kennedy v. Columbus Mfg., Inc.*,

2017 WL 4680079, *3 (N.D. Cal. 2017); *Staton v. U.S. Airways Inc.*, 2011 WL 855789, *3 (D. Ariz. 2011).  *Holowecki* is a "liberal standard in favor of the employee," such that "documents filed by an employee with the EEOC should be construed, to the extent consistent with permissible rules of interpretation, to protect the employee's rights and statutory remedies."  *Staton*, 2011 WL 855789 at *4.

Here, the FAC alleges that Plaintiff completed an intake interview with the EEOC on December 13, 2019 but does not allege that Plaintiff filed an intake questionnaire at that time.  (Doc. 12 at 23 ¶ 28.)  Additionally, in the formal charge that Plaintiff eventually filed in December 2021, Plaintiff referred only to his "intake interview . . . on 12/13/2019" and made no reference to an intake questionnaire.  (*Id.* at 8.)  It follows that the intake interview in December 2019 does not qualify as a "charge."  Under *Holowecki*, the charge must take the form of a "filing" and comply with the regulatory requirements set forth in 29 C.F.R. § 1601.12, which requires "a written statement."  552 U.S. at 402-03.  There was no filing or written statement here.[15]

### b.   Equitable Tolling

The failure to timely file a charge is not necessarily fatal to Plaintiff's ADA claim. Although the charge-filing requirement is mandatory in the sense that a court must enforce the rule if timely raised, *Fort Bend Cnty., Texas v. Davis*, 139 S. Ct. 1843, 1849 (2019), "filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling."  *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982).  *See also O'Connor v. Soul Surgery LLC*, 2022 WL 4017408, *4 (D. Ariz. 2022) ("The Ninth Circuit honors EEOC mandatory filing rules . . . absent 'any equitable consideration to the contrary.'").  Thus, to avoid dismissal, Plaintiff must "plead facts supporting equitable tolling, or some other saving doctrine."  *Mallard v. Battelle Energy*

---

[15]    The FAC also fails to allege facts from which the Court may infer that Plaintiff requested that the EEOC take remedial action during the December 2019 interview.  The FAC merely describes "an interview with . . . an intake/investigator officer on 12/13/2019 at 12:45 PM."  (Doc. 12 at 23 ¶¶ 28.)  This provides an additional reason why the interview fails to satisfy *Holowecki*'s definition of a "charge."

*All., LLC*, 2013 WL 2458620, *7 (D. Idaho 2013).  Here, neither side suggests that waiver or estoppel apply.  Thus, the Court limits its analysis to equitable tolling.

"Equitable tolling focuses on a plaintiff's excusable ignorance and lack of prejudice to the defendant." *Leong,* 347 F.3d at 1123.  "The equitable tolling doctrine has been applied by the Supreme Court . . . sparingly; for example, the Supreme Court has allowed equitable tolling when the statute of limitations was not complied with because of defective pleadings, when a claimant was tricked by an adversary into letting a deadline expire, and when the EEOC's notice of the statutory period was clearly inadequate." *Scholar v. Pac. Bell*, 963 F.2d 264, 267-68 (9th Cir. 1992).  "Courts have been generally unforgiving, however, when a late filing is due to claimant's failure to exercise due diligence in preserving his legal rights." *Id.* at 268 (internal quotations omitted). *See also Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 151 (1984) ("One who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence.").

As an initial matter, the Court notes that both parties have presented materials outside the pleadings to support their competing positions about whether equitable tolling should apply.  (Doc. 17 at 13-23; Doc. 28-1; Doc. 28-2.)  Defendants, for example, rely heavily on an exhibit entitled "Excerpts from the EEOC's FOIA Response" that is attached to their motion.  (Doc. 17 at 7-8, 13-23.)  Defendants contend that the Court may consider this exhibit because "Plaintiff's original complaint and FAC specifically refer to the communications with the EEOC and cross-reference them as providing factual foundation for Plaintiff's claim."  (*Id.* at 7 n.35, internal citations omitted.)

"When ruling on a Rule 12(b)(6) motion to dismiss, if a district court considers evidence outside the pleadings, it must normally convert the 12(b)(6) motion into a Rule 56 motion for summary judgment, and it must give the nonmoving party an opportunity to respond." *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003).  "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *Id.* at 908.  As

relevant here, a document is "incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Id.*

Here, Defendants overstate the connection between the references in Plaintiff's FAC and the information contained in the documents attached to their motion.  Although the FAC alleges that Plaintiff failed to file a timely charge because the EEOC "provided misleading and incomprehensible instructions" to him and "lost [his] case" (Doc. 12 at 23 ¶ 28), the Court is not convinced that this allegation "incorporates by reference" the materials now provided by Defendants.   Those materials only contain email communications between Plaintiff and the EEOC between April 2021 and December 2021. (Doc. 17 at 17-23.)  Although the FAC is not a model of clarity on this point, it seems possible (if not likely) that the EEOC's purported "misleading and incomprehensible instructions" were provided to Plaintiff much earlier than this, such as during or around the time of the October 2019 intake interview.   Under these circumstances, it would be improper for the Court to consider the materials attached to Defendants' motion without converting it into a motion for summary judgment and giving Plaintiff an opportunity to respond.  Thus, the Court does not consider these materials in deciding whether dismissal is appropriate.  *See also Rencher v. Wells Fargo Bank, N.A.*, 2015 WL 5120099, *3 (D. Idaho 2015) ("Courts regularly decline to consider declarations and exhibits submitted in support of or opposition to a motion to dismiss . . . if they constitute evidence not referenced in the complaint or not a proper subject of judicial notice.").

Nevertheless, Plaintiff bears the burden of alleging facts that, assumed true, demonstrate the applicability of equitable tolling.  In the FAC, Plaintiff alleges that the "EEOC provided misleading and incomprehensible instructions" and "the EEOC lost [his] case . . . due to COVID-19."  (Doc. 12 at 23 ¶¶ 27-28.)  The Court thus interprets the FAC as alleging two possible bases for equitable tolling: (1) Plaintiff was misled by the EEOC; and (2) the COVID-19 pandemic prevented Plaintiff from timely filing.

…

i.     Misled By The EEOC

"An equitable exception to the exhaustion requirement is available when an EEOC representative misleads the plaintiff concerning his claim." *Josephs v. Pac. Bell*, 443 F.3d 1050, 1054 (9th Cir. 2006).  Specifically, equitable tolling applies where the plaintiff "(1) diligently pursued his claim; (2) was misinformed or misled by the administrative agency responsible for processing his charge; (3) relied in fact on the misinformation or misrepresentations of that agency, causing him to fail to exhaust his administrative remedies; and (4) was acting pro se at the time."  *Id.* (citation omitted).

Here, Plaintiff alleges that he completed an intake interview with the EEOC on December 13, 2019, about three weeks after his resignation.  (Doc. 12 at 4, 23 ¶ 28.) Plaintiff further alleges that the EEOC, presumably during or after the interview, "provided misleading and incomprehensible instructions on the next steps necessary to file a charge" and lost his case, "resulting in the 300 day[] [statute] of limitations to be exceeded."  (*Id.* 23 ¶¶ 27-28.)

In *Josephs*, the Ninth Circuit found that the plaintiff, who was "acting pro se at the time," "diligently pursued his claim by going to the EEOC office shortly after his termination."  443 F.3d at 1054.  Here, Plaintiff was *pro se* at all relevant times and completed an intake interview with the EEOC less than a month after resigning.  (Doc. 12 at 4, 23 ¶ 28.)  Nevertheless, the Court is doubtful that Plaintiff's interview, alone, demonstrates diligence because Plaintiff then waited more than a year and a half to file a charge (unlike the plaintiff in *Josephs*, who filed a charge less than six months after his initial meeting with the EEOC).  At any rate, even assuming Plaintiff was diligent, his tolling arguments fail for an independent reason.

Specifically, the FAC fails to allege any *facts* suggesting that Plaintiff "was misinformed or misled" by the EEOC and "relied in fact on the misinformation or misrepresentations . . . , causing him to fail to exhaust his administrative remedies." *Josephs*, 443 F.3d at 1054.  In *Josephs*, the plaintiff was told by an EEOC representative "that he needed to retain counsel before filing a claim," followed that advice and retained

counsel, and "by the time the EEOC responded to counsel's inquiries, the time for filing the claim had expired." *Id.* In contrast, here, Plaintiff provides no details about how he was misled by the EEOC as to the "next steps of his charge" (Doc. 12 at 23 ¶ 28). Similarly, Plaintiff alleges the EEOC "lost [his] case" but provides no supporting details. These conclusory allegations do not, on their own, support a claim for equitable tolling. *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *Ivey*, 673 F.2d at 268 (a liberal interpretation of a *pro se* pleading may not supply essential elements of the claim that were not initially pleaded).

### ii.   COVID-19

This leaves Plaintiff's second justification for his untimely filing—the COVID-19 pandemic. In their motion papers, the parties debate whether the EEOC completely paused its operations in March 2020 in response to COVID-19. (*Compare* Doc. 28 at 6 ["Therefore, if it wasn't for the dooming impact of COVID-19, [and the] EEOC's temporary complete shutdown and suspension of issuance of charge documents in response to the COVID-19 pandemic on March 21, 2020 until August of 2020, . . . Plaintiff would have been able to file a charge of discrimination well within the 300 days . . . ."] *with* Doc. 29 at 2 ["Contrary to Plaintiff's assertions, the EEOC did not completely shut down, and Plaintiff was not prevented from filing a charge due to COVID-19."].) However, in the only document that matters for purposes of evaluating Defendants' request for dismissal under Rule 12(b)(6)—the FAC itself—there is no allegation that the EEOC completely ceased its operations between March 2020 and August 2020. Instead, the FAC's only allegation about COVID-19 is that the "EEOC lost [Plaintiff's] case . . . due to COVID-19." (*Id.* at 23 ¶ 28.) In other words, although whether the EEOC stopped operating during this time is certainly relevant to whether the COVID-19 pandemic created extraordinary circumstances that prevented Plaintiff's timely filing, Plaintiff does not plead this fact.[16]

---

[16]   The Court also notes that some of the materials Plaintiff attached to his motion papers tend to undermine, rather than support, the suggestion that the EEOC completely shut down during this period. (Doc. 28-2 at 1, emphasis added ["The EEOC has closed its physical offices to the public and implemented agencywide expanded telework due to

"Equitable tolling applies . . . when extraordinary circumstances beyond the plaintiff's control made it impossible to file a claim on time." *Stoll v. Runyon*, 165 F.3d 1238, 1242 (9th Cir. 1999) (citation omitted).  Although not binding, the Court is persuaded by the decisions of other district courts analyzing the circumstances under which the COVID-19 pandemic may justify equitable tolling.  Specifically, courts have held that although the COVID-19 pandemic itself was extraordinary, to avoid dismissal via equitable tolling, a plaintiff must plead facts indicating that it was the pandemic that caused the untimely filing.  *See, e.g.*, *Williams v. Santos*, 2022 WL 2176582, *4 (C.D. Cal. 2022) ("While the COVID-19 pandemic may have presented 'extraordinary circumstances beyond Plaintiff's control,' . . . Plaintiff fails to allege that these circumstances 'made it impossible' to initiate EEO contact within the 45-day period."); *United States v. Melara*, 2022 WL 1157374, *3 (D. Mass. 2022) ("[T]he COVID-19 pandemic is not an adequate excuse for an untimely filing if a petitioner has not . . . shown a specific difficulty to submit a timely filing."); *Smith v. United States*, 2021 WL 5910486, *4 (W.D. Wash. 2021), *report and recommendation adopted*, 2022 WL 36896 (W.D. Wash. 2022) ("[A]lthough a plaintiff may be able to show that circumstances related to COVID-19 are sufficiently extraordinary to trigger equitable tolling, the COVID-19 pandemic does not automatically warrant equitable tolling for any plaintiff who seeks it on that basis, because the plaintiff must establish . . . that the COVID-19 pandemic specifically prevented him from filing his claim.") (cleaned up); *United States v. Turner*, 2021 WL 4256304, *3 (W.D. Ark. 2021), *report and recommendation adopted*, 2021 WL 4255637 (W.D. Ark. 2021) ("The COVID-19 pandemic does not automatically warrant equitable tolling for any movant who seeks it on that basis.  The movant must establish he was pursuing his rights diligently and that the COVID-19 pandemic specifically prevented him from filing this motion.").[17]

---

COVID-19.  *But our work continues remotely . . . .*"].)

[17]    *See also Flagg v. Jones*, 2022 WL 4371482, *1 (M.D. Ala. 2022) (dismissing the plaintiff's claims and reasoning that the plaintiff's "conclusory claim that COVID-19 had an 'impact' on his filings" was insufficient to warrant equitable tolling); *Goerss v. Pac. Gas & Elec. Co.*, 2021 WL 4932134, *6 (N.D. Cal. 2021) ("[A]lthough [the plaintiff] theoretically could argue that COVID-19 was . . . an impediment to her, she would have to explain how the pandemic could justify her not filing until July 2021."); *McDonald v.*

Here, too, although the COVID-19 pandemic presented "extraordinary circumstances," Plaintiff fails to plead how the COVID-19 pandemic specifically prevented him from filing a charge within the limitation period. For example, Plaintiff does not allege how he learned the EEOC "lost" his case, how he or the EEOC were affected by the COVID-19 pandemic in such a way that timely filing was impeded, or why the pandemic justified his failure to act for nearly two years, between the December 2019 interview and the October 3, 2021 charge (or, alternatively, facts that show he diligently pursued his claims during this time but was prevented from filing due to the pandemic). Thus, Plaintiff has not alleged sufficient facts to establish that he is entitled to equitable tolling based on the COVID-19 pandemic and attendant circumstances. *See also Lewis v. Postmaster Gen. of United States*, 2022 WL 109007, *2 (3d Cir. 2022) ("Although Lewis alleges that Covid-19 was the cause of the EEOC's delayed response, he fails to connect the pandemic to his specific situation.").[18]

### 3.    ACRA

Under ACRA, a charge be filed with either the ACRD or the EEOC within 180 days of when the alleged discrimination occurred. A.R.S. § 41-1481(A). Thus, Plaintiff was required to exhaust his ACRA claim.[19]

---

*Regions Bank (Inc.) (Alabama)*, 2021 WL 4816645, *9 (N.D. Ga. 2021) ("The global COVID-19 pandemic and the attendant 'stay at home orders' certainly created an extraordinary circumstance. Plaintiff has, not, however, pleaded facts indicating that it was the pandemic that caused her to miss the deadline for filing her EEOC charge.") (internal citations omitted); *Hood v. Cath. Health Sys., Inc.*, 2020 WL 8371205, *7 (W.D.N.Y. 2020) ("[Although] [t]he COVID-19 pandemic has indisputably been deeply tragic and disruptive to many aspects of life and legal practice, . . . Plaintiff has failed to come forward with specific evidence that the pandemic or the in-person work restrictions . . . actually prevented her from meeting the April 22, 2020 deadline.").

[18]    Given this conclusion, there is no need to address Defendants' alternative argument that Plaintiff's October 3, 2021 charge would remain untimely even if the charge-filing deadline was tolled for four to five months. (Doc. 29 at 2-3.)

[19]    To the extent Plaintiff's constructive discharge and retaliation claims arise under the Arizona Equal Employment Act ("AEPA"), which "allows a former employee to sue for a discharge that violates a state statute or that is in retaliation for reporting a violation of the Arizona Constitution or a state statute," *Peterson v. City of Surprise*, 418 P.3d 1020, 1023 (Ariz. Ct. App. 2018) (citing A.R.S. § 23-1501(A)), Arizona case law is clear that a failure to exhaust administrative remedies for purposes of ACRA bars claims under AEPA that are based on ACRA violations. *See id.* at 1025 ("Because Peterson forfeited her exclusive remedy for sex discrimination under the Arizona Civil Rights Act by failing to file an administrative charge, the EPA does not permit her to refashion her discrimination claim

As an initial matter, although both sides suggest that a 300-day limitations period (*i.e.*, the limitations period for exhaustion of federal employment discrimination claims in deferral states like Arizona) applies in relation to all of Plaintiff's claims, Plaintiff's ACRA claim was subject to the 180-day limit. *Cox v. Glob. Tool Supply LLC*, 2020 WL 4464384, *2 (D. Ariz. 2020); *Terry v. United Parcel Serv. Inc.*, 2018 WL 8619996, *2 (D. Ariz. 2018). Here, Plaintiff filed a formal charge with the EEOC on October 3, 2021 (Doc. 12 at 8), well outside both the 180-day and 300-day limits. Thus, whether Plaintiff's ACRA claim is subject to dismissal based on failure to exhaust turns on the same issues as his ADA claim: whether the intake interview fulfilled the charge filing requirement and, alternatively, whether equitable tolling should apply.

### A.    "**Charge**"

Section 41-1481(A) of the Arizona Revised Statutes provides that "[a] charge shall be in writing on oath or affirmation and shall contain the information, including the date, place and circumstances of the alleged unlawful employment practice, and be in the form as the [ACRD] requires." *Id.* This language is similar to the federal regulations defining "charge" for federal discrimination claims. *See* 29 C.F.R. § 1601.12(b) ("[A] charge is sufficient when the Commission receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of."). Thus, for the same reasons that the FAC fails to allege facts indicating that the intake interview constituted a "charge" under *Holowecki* and 29 C.F.R. § 1601.12(b), the interview does not fulfill the requirements of A.R.S. § 41-1481(A).[20] *See also Cox*, 2022 WL 4356915 at *4 (holding that an initial email to the EEOC was not a charge under A.R.S. § 41-1481(A)); *Arizona ex rel. Horne v. Geo Grp., Inc.*, 816 F.3d 1189, 1195 n.2 (9th Cir. 2016) (citing § 41-1481(A) for the proposition that "[a] 'charge' is a written and verified statement that a person has engaged or is engaging in an unlawful employment practice"). Thus, Plaintiff's "failure to comply with the statutory

_____

into a retaliation claim under § 23-1501(A)(3)(c)(ii).").

[20]    To the Court's knowledge, there is no Arizona case applying A.R.S. § 41-1481(A) to an intake interview with the EEOC.

1    requirements precludes an action under ACRA for that alleged discriminatory act, unless

2    Plaintiff provides evidence of waiver, estoppel, or equitable tolling."   *Terry*,

3    2018 WL 8619996 at *3 (citing *Peterson*, 418 P.3d at 1024).   *See also Cox*, 2022 WL

4    4356915 at *4 ("Arizona's equitable tolling rules apply to ACRA claims.").

5                          B.      **Equitable Tolling**

6             Under Arizona law, equitable tolling allows plaintiffs to extend an expired

7    limitations period "if they have been prevented from filing in a timely manner due to

8    sufficiently inequitable circumstances."   *McCloud v. Stat*e, 170 P.3d 691, 696 (Ariz. Ct.

9    App. 2007) (quoting *Seitzinger v. Reading Hosp. & Med. Ctr.*, 165 F.3d 236, 240 (3d Cir.

10   1999)).   *See also Kyles v. Contractors/Eng'rs Supply, Inc.*, 949 P.2d 63, 65 (Ariz. Ct. App.

11   1997) ("Equitable tolling applies when the plaintiff is excusably ignorant of the limitations

12   period and the defendant would not be prejudiced by the late filing.").   "[T]he facts

13   necessary to support equitable tolling must be alleged in the complaint."   *Cox*, 2020 WL

14   4464384 at *2 (applying Arizona equitable tolling law).

15            Here, for the same reasons that Plaintiff is not entitled to equitable tolling under

16   federal law for his ADA claim, he is not entitled to equitable tolling under Arizona law for

17   his ACRA claim.   Simply put, Plaintiff has not alleged specific facts showing that the

18   EEOC made any misstatements in its communications that misled him as to the charge-

19   filing requirements or that the COVID-19 pandemic prevented him from filing a charge by

20   the applicable deadline.[21]

21                          B.      **Statute Of Limitations**

22            Because Plaintiff's ADA and ACRA claims are dismissed for failure to exhaust

23   administrative remedies, it is unnecessary to resolve Defendants' alternative argument that

24   these claims are also barred by the applicable statutes of limitations.

25            As for Plaintiff's Rehabilitation Act claim, it is subject to a two-year statute of

26   ────────────────────

27   [21]      In his response, Plaintiff provides more information about how COVID-19 affected
     his filing abilities.   (Doc. 28 at 5-7.)   Because these facts are not alleged in the FAC, the
28   Court does not consider them in its dismissal analysis.   To be clear, however, the Court
     does not intend to suggest that such facts, if properly pleaded, would be sufficient (or
     specific enough) to support equitable tolling.

limitations per A.R.S. § 12-542.  *Ervine*, 753 F.3d at 869 ("The statute of limitations for claims under Section 504 of the Rehabilitation Act is provided by analogous state law."); *Madden-Tyler v. Maricopa Cnty.*, 943 P.2d 822, 829 (Ariz. Ct. App. 1997) (applying Arizona's two-year personal injury statute of limitations to a Rehabilitation Act claim). Section 12-542 provides that a claim must be brought within "two years after the cause of action accrues."  *Id.*  "Although the limitations period is adopted from state law, a claim under the Rehabilitation Act accrues according to federal law."  *Ervine*, 753 F.3d at 869. "Because each and every discrete discriminatory act causes a new claim to accrue under Section 504 of the Rehabilitation Act," *id.* at 871, any discriminatory acts that Defendants took within two years of when Plaintiff initiated this action (*i.e.*, after January 3, 2020) are actionable.  "All prior discrete discriminatory acts, however, are untimely filed and no longer actionable."  *Id.* (internal quotations omitted).  Here, construing the FAC in the light most favorable to Plaintiff, the latest alleged act of discrimination occurred on November 27, 2019.  (Doc. 12 at 4.)  Accordingly, Plaintiff's Rehabilitation Act claim is time-barred unless he can show the statute of limitations should be tolled.  For reasons stated elsewhere in this order, the FAC does not plead facts sufficient to establish an entitlement to equitable tolling.  Thus, Plaintiff's Rehabilitation Act claim is dismissed.

### C.   Failure To State A Claim

Because the Court has dismissed Plaintiff's ADA and ACRA claims for failure to exhaust administrative remedies and Plaintiff's Rehabilitation Act claim as time-barred by the applicable statute of limitations, the Court declines to address Defendants' alternative arguments for dismissal pursuant to Rule 12(b)(6) and Rule 8.

### IV.   Leave To Amend

Plaintiff requests leave to file an amended complaint to provide "further clarification and cures to the curable alleged defects" in his FAC.  (Doc. 28 at 4-5.)

Rule 15(a) of the Federal Rules of Civil Procedure "advises the court that 'leave [to amend] shall be freely given when justice so requires.'"  *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (citation omitted).  "This policy is 'to be applied

with extreme liberality.'" *Id.* (citation omitted).  Thus, leave to amend should be granted unless "the amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006).

Here, Defendants rely on futility in opposing leave to amend, contending that "amendment would be futile as he cannot plead his way around his failure to exhaust administrative remedies and failure to comply with the statute of limitations, both of which are fatal to his claims."  (Doc. 29 at 6-7 n.32.)  Although Defendants are likely correct, it also seems conceivable that amendment would not be futile.  Given this possibility, and in light of Plaintiff's *pro se* status, Plaintiff's request for leave to amend is granted.  *See also Fair Hous. Council of Cent. Calif., Inc. v. Nunez*, 2012 WL 217479, *4 (E.D. Cal. 2012) ("Ordinarily, courts will defer consideration of challenges to the merits of a proposed amended pleading until after leave to amend is granted and the amended pleading is filed."); *Green Valley Corp. v. Caldo Oil Co.*, 2011 WL 1465883, *6 (N.D. Cal. 2011) (noting "the general preference against denying a motion for leave to amend based on futility").

…

…

…

…

…

…

…

…

…

…

…

…

- 26 -

Accordingly,

**IT IS ORDERED** that the Defendants' motion to dismiss (Doc. 17) is **granted**.

**IT IS FURTHER ORDERED** that Plaintiff may file a Second Amended Complaint within 21 days of the issuance of this order.  Any changes shall be limited to attempting to cure the deficiencies raised in this order and Plaintiff shall, consistent with LRCiv 15.1(a), attach a redlined version of the pleading as an exhibit.

**IT IS FURTHER ORDERED** that if Plaintiff does not file a Second Amended Complaint within 21 days of the issuance of this order, the Clerk shall enter judgment accordingly and terminate this action.

Dated this 9th day of December, 2022.

Dominic W. Lanza
United States District Judge